Terry J. Harris, WyBar # 5-2068
HARRIS, HARRIS & QUINN, P.C.
P.O. Box 368
2618 Warren Avenue
Cheyenne, Wyoming  82003-0368
Phone: (307) 638-6431
Email: tjharrispc@gmail.com

Ian K. Sandefer, WSB # 6-4334
Jamie M. Woolsey, WSB # 6-3985
Sandefer & Woolsey, Trial Lawyers LLC
143 North Park Street
Casper, WY 82601
Phone: (307) 232-1977; Fax: (307) 333-6508
Email: ian@swtriallawyers.com

Edwin S. Wall, WyBar # 5-2728
Wall Law Office
43 East 400 South
Salt Lake City, Utah  84111
Phone: (801) 746-0900
Email: Edwin@edwinwall.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| **UNITED STATES OF AMERICA**, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| vs. ) | Criminal No. 19-CR-171-ABJ |
| ) | |
| **MATTHEW "TY" BARRUS,** ) | |
| **GREGORY J. BENNETT, and** ) | |
| **DEVIN E. DUTSON,** ) | |
| ) | |
| *Defendants*. ) | |

## DEFENDANTS' JOINT MOTION TO COMPEL PRODUCTION OF *BRADY*[1] MATERIALS OR, ALTERNATIVELY, RULE 16, F.R.Cr.P., DISCOVERY MATERIALS NEGLIGENTLY OR INTENTIONALLY WITHHELD BY THE GOVERNMENT

COME NOW the Defendants, by and through their undersigned counsel, and hereby move this Court to compel the Government's production to Defendants of *Brady* materials previously withheld by the Government over the past two years. Similarly, and to the extent the Government

---

1 *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed.2d 215, 83 S. Ct. 1194 (1963).

asserts any such materials are inculpatory to these Defendants, to compel Rule 16, F.R.Cr.P., discovery notwithstanding. In support, Defendants state the following:

### BACKGROUND

1.      On September 26, 2019, the Government received an *Indictment* charging Mr. Barrus, Mr. Bennett  and Mr. Dutson with one count of "Conspiracy to Commit Healthcare Fraud" (Count 1), one count of "Healthcare Fraud" (Count 2), and various individual counts of "Engaging in a Monetary Transaction Involving Criminally-Derived Property" (Counts 3 through 11). (ECF No. 1). On Government motion filed recently, this Court, on January 24, 2022, granted the Government leave to dismiss, without prejudice, Counts 5 and 7 through 11. (ECF No. 168). In the *Indictment*, the Government informs us that "*Wyoming Medicaid will reimburse services only if the services are therapeutically essential* and the provider is a certified substance abuse treatment provider, or employed by or under contract with a certified substance abuse treatment provider."  *Id*., ¶ 5 (Italicized emphasis added).  The Government informs us that, at all times relevant to its *Indictment*, Northwest Wyoming Treatment Center (hereinafter "NWTC") "was an enrolled provider in Wyoming Medicaid and a Wyoming-certified substance abuse treatment provider" operating "a residential substance abuse treatment program for adolescents in Powell, Wyoming" providing substance abuse treatment to Wyoming Medicaid beneficiaries and that these Defendants each were employed by NWTC. *Id*., ¶¶ 7-9.  Further, the Government asserts that in connection with that adolescent addiction treatment provided to these Wyoming Medicaid beneficiaries, "Defendants **BARRUS** and **BENNETT** caused false and fraudulent bills to be submitted to Wyoming Medicaid under procedure codes H0005, H0047, H2015, and H2015-hk when, as **BARRUS** and **BENNETT** well knew, **(a)** the beneficiaries had not participated in any therapeutically-necessary substance abuse treatment as defined by Wyoming Medicaid and the claimed procedure code, **(b)** the billed-for

activities were not covered by Wyoming Medicaid, and **(c)** the billed-for activities included (among other things) sleeping, showering, cooking, eating, cleaning, watching TV, playing video games, watching other people play video games, listening to music, napping on the couch, 'hanging out' and talking with other clients, playing basketball....[the government goes on to list approximately 30 more activities that it asserts are not 'therapeutically-necessary'].["][2]  *Id*. at pp. 3-4, ¶ 10 (Bold emphasis in original).

    2.      On October 2 and 3, 2019, this Court issued *Discovery and Scheduling Order*(s) as to the Government, Mr. Bennett, Mr. Barrus and Mr. Dutson.  (ECF Nos. 40, 49 and 52). Each of this Court's *Discovery and Scheduling Order*(s) expressly directed the Government to provide Defendants' counsel:

> no later than twenty-one (21) days after entry of this Order, all the information to which the defendant is entitled pursuant to Fed. R. Crim. P. 16, namely:
>
> > **(A) Defendant's Statements:** The government shall disclose and make available for inspection, copying or photographing: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody, or control of the government, the existence of which

---

2 Contrary to the Government's assertion to the Grand Jury and the resulting allegation within the *Indictment*, Defendants represent to the Court that Lisa Brockman, Program Manager with the Wyoming Department of Health, Division of Healthcare Financing, was interviewed February 21, 2017 by FBI Special Agent Arlen Scholl (the FBI agent who in turn testified to the Grand Jury in this matter) and she informed Agent Scholl that activities such as "skills training," including things such as wilderness therapy and recreation, can be both provided and properly billed to Wyoming Medicaid by a provider so long as these activities are part of the client's treatment plan, provided by a trained therapist (or paraprofessional supervised by the therapist), and tied to a goal within that treatment plan.  Furthermore, Defendants now have designated an expert in the field of treating teens with substance abuse issues, Dr. Frederic G. Reamer, Ph.D., who will testify that the type of adolescent addiction treatment activities that the Government has listed as having been fraudulently billed by NWTC are not only proper, but part of the standard of care for treating teens struggling with addiction. (*See* ECF No. 148).

is known or by the exercise of due diligence may become known to the attorney for the government; that portion of any written record containing the substance of any relevant oral statement made by the defendant whether before or after arrest in response to interrogation by any person then known to the defendant to be a government agent * * *.

**(C) Documents and Tangible Objects:** The government shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.

(ECF Nos. 40, 49 and 52; ¶ 2). Those *Discovery and Scheduling Order*(s) also expressly directed the

Government to:

<u>promptly</u> disclose to the defendant all material for which disclosure is mandated by *Brady v. Maryland*, 373 U.S. 83 (1963). * * *

(ECF Nos. 40, 49 and 52; ¶ 6) (emphasis supplied by this Court).

     3.      On or around October 24 and November 1, 2019, the Government produced to the

Defendants approximately 150,000 pages of electronic discovery in this matter. Within the

voluminous documentary discovery are a very limited number of materials relating to what appear to

be Wyoming Medicaid program audits of NWTC: (1) a 4-page document the Government has

named "NWTC_Records_Request" that includes a copy of a November 10, 2015 patient records

request sent to NWTC by "Mark Gaskill, Manager of Quality Assurance and Program Integrity,

Wyoming Department of Health, Division of Healthcare Financing" (*Attachment 1* hereto, Bates

4

numbered "Barrus-132493" through "Barrus-132496")[3]; (2) a 3-page document the Government has named "NWTC_Additional_lnformation_Request" that consists of a March 14, 2016 patient records and software request sent to NWTC by Mark Gaskill (*Attachment 2* hereto, Bates numbered "Barrus-132463" through "Barrus-132465"); (3) a 3-page document the Government has named "NWTC_Referral_Xerox" that includes, on page 2, a copy of an August 14, 2014 similar patient records request sent to NWTC from the "Medical Policy Department" within the Wyoming Department of Health (*Attachment 3* hereto, Bates numbered "Barrus-138766" through "Barrus-138768")[4]; (4) a 2-page document the Government has named "RecReq2" that consists of a January 11, 2017 similar patient records request sent to NWTC by "Andrew Chapin, Program Integrity Manager, Division of Healthcare Financing" (*Attachment 4* hereto, Bates numbered "Barrus-138043" through "Barrus-138044").

A review of these Government discovery documents makes clear the fact that the Wyoming Medicaid program, through various related agencies, entities and/or agents – *regardless of whether the involved "agency" is considered by these federal prosecutors to be part of their "prosecution team"* – conducted various audits of, and made various patient records requests relating to NWTC's treatment and billing practices during the period of the alleged conspiracy and so-called "scheme." However, as can be seen, these discovery documents produced to Defendants in the fall of 2019 suggest the very earliest any such audit was initiated was August 14, 2014 (*Attachment 3* hereto, *supra*).

---

3 The Government also produced what appears to be this very same 4-page document, named "NWTC _ 00151 ReqLet" (Bates numbered "Barrus-138602" through "Barrus-138605").
4 A review of this 3-page document produced by the Government fairly reflects the challenges a reader likely will have relating any one of the three pages to the other two pages.

On December 4, 2015, Mark Gaskill completed an "Allegation of Fraud Referral" form, seeking to coordinate with MFCU a fraud investigation of NWTC (*Attachment 5* hereto, Government discovery document named "NWTC _MFCU _Referral"; Bates numbered "Barrus-132467" through "Barrus-132472"), and on December 16, 2015, Mark Gaskill (along with others connected to whatever auditing of NWTC had been taking place) performed a "site visit" to NWTC, conducted a recorded interview of Ty Barrus and Greg Bennett, and collected additional NWTC records, after which NWTC on January 22, 2016, was formally sanctioned by Wyoming Medicaid (Wyoming Department of Health, Division of Healthcare Financing) and placed on "Prepayment Review" (*Attachment 6* hereto, January 22, 2016 letter from Mark Gaskill to NWTC, Government discovery document named "NWTC_Notice _Prepayment_Review"; Bates numbered "Barrus-132488" through "Barrus-132489") and on January 28, 2016, NWTC was formally notified that they owed Wyoming Medicaid $1,349,403.50 for claims previously paid. (*Attachment 7* hereto, January 28, 2016 letter from Mark Gaskill to NWTC, Government discovery document named "NWTC_Notice_of_Recovery"; Bates numbered "Barrus-120009" through "Barrus-120023").[5]

---

[5] The Government's fall 2019 discovery produced in this matter also included some heavily <u>redacted</u> Program Integrity/Office of Healthcare Financing, MFCU and Wyoming DCI audit or investigative materials related to the investigation into Dr. Gibson Condie and BHBMHG, covering the time period of approximately January 29, 2010, through on or about November 20, 2012 (Bates numbered "Barrus-201676" through "Barrus-201704"). However, the records clearly do not represent a "complete" audit package or record, and mostly consist of correspondence between Dr. Condie and these Wyoming Medicaid actors. Although incomplete, these materials are nonetheless important, as Dr. Condie acted as NWTC's third-party supervising billing agent for Wyoming Medicaid until sometime in 2015, following the Wyoming legislature in July 2014 having authorized Master's-level clinicians to bill Wyoming Medicaid for services.

On November 5, 2021, some two years after the discovery production targets set by this Court's *Discovery and Scheduling Order*(s) discussed above, the Government produced an unredacted copy of this MFCU investigative report. This unredacted MFCU report and the information therein first revealed to these Defendants, will be further discussed herein.

The Wyoming Medicaid audit culminating with Mark Gaskill's December 16, 2015 site visit, the ensuing January 22, 2016 sanctioning of NWTC, and January 28, 2016 demand NWTC repay Wyoming Medicaid $1,349,403.50 for claims previously paid, effectively put an end to NWTC and the adolescent male addiction treatment NWTC had been providing to Wyoming Medicaid beneficiaries, and very few claims were submitted by NWTC to Wyoming Medicaid following these events. Mark Gaskill even wrote to NWTC three months later regarding the fact that NWTC had not submitted claims since February 2016. (*Attachment 8* hereto, April 14, 2016, letter from Mark Gaskill to NWTC; Bates numbered "Barrus-132466").

4.     From the outset of their representation in this matter, Defendants Barrus, Bennett and Dutson have represented to counsel that a number of audits of NWTC had been performed and patient records requested by Wyoming Medicaid and/or its agents, beginning well prior to the audit(s) that resulted in Mark Gaskill's December 16, 2015, site visit and ensuing sanction and repayment demand. However, these prior audits and records requests never resulted in any report or other meaningful feedback to NWTC that might have suggested their addiction treatment services being billed to Wyoming Medicaid were improperly coded or billed, and certainly nothing to suggest the associated claims were in any way illegal.

As this Court previously has been informed, counsel for Greg Bennett performed a site visit to the Julie Lane, Powell, Wyoming NWTC facility in late January 2020, approved by AUSA Heimann. That visit resulted in Ms. Woolsey and her investigator retrieving approximately 30 boxes of documents and records from the Julie Lane facility. In addition to the tedious task of reviewing the approximately 150,000 pages of discovery produced in 2019 by the Government in this matter, counsel for the Defendants have been reviewing these additional 30 boxes of documents and records. Within those records retrieved from the Julie Lane facility there is, in fact, evidence of a number of

prior audits of NWTC: (1) a 2-page document consisting of a December 21, 2012, patient records request sent to NWTC by "Susan Malm, Program Integrity Supervisor, Division of Healthcare Financing," Wyoming Department of Health. (*Attachment 9* hereto); and (2) a 4-page document consisting of an April 17, 2012, patient records request sent to NWTC by "ACS, a Xerox Company" (*Attachment 10* hereto). These additional audit or patient records requests are not contained within the voluminous discovery the Government produced in this matter. And, as can be seen, much like the later audit records the Government actually produced (*Attachments 1* through *4*, *supra*), these additional records clearly do not represent a "complete" audit package or record.

5.     Defendants Barrus and Bennett have always understood and believed that, in order to continue to provide treatment services and bill Wyoming Medicaid for such services, NWTC was required to comply with Wyoming Medicaid's audit and record-request requirements. It was Defendant Bennett who, with assistance of others at NWTC, compiled the requested NWTC patient records and in turn sent them to Wyoming Medicaid or its agent upon request. Defendant Bennett estimates that an approximate average of the number of document pages sent in response to these audit requests was 300-500 pages per client requested for each month requested. The production was substantial, requiring bankers boxes to send the documents to Cheyenne.

6.     On August 13, 2021, Defendants made a *Brady* demand[6] on the Government for all prior Medicaid audits and/or record requests of NWTC or BHBMHG; however, the Government

---

6 The exact language of this specific *Brady* request was as follows:

(5) All prior Medicaid audits and/or record requests of NWTC, or Big Horn Basin Mental Health Group (BHBMHG) to the extent the BHBMHG audit(s) or record request(s) involved any one of these three defendants as a BHBMHG provider, whether done by Wyoming Medicaid or an agent of Wyoming Medicaid, including but not limited to "Xerox", "ACS" (ACS's letterhead suggests they are "A Xerox Company"), the Centers for Medicare & Medicaid Services (CMS), Program Integrity/Office of Healthcare Financing, MFCU, Myers

elected not to provide any documents in response. On October 22, 2021, the Government sent an

email in response to Defendants' *Brady* demand stating, in relevant part, "that Wyoming Medicaid

(including its Program Integrity Unit) is <u>not</u> part of the prosecution team, which consists of the

USAO, the Wyoming AG's Medicaid Fraud Control Unit, and the FBI's case agents," and specific to

the audits:

---

and Stauffer (RAC), or any other Wyoming Medicaid Fiscal Agent Contractor (FAC), entity
or agency performing such audits or requests on behalf of Wyoming Medicaid.

In support thereof, Defendants even made specific reference to the April 2012 patient records request
the Government had failed to produce, expressly informing these federal prosecutors that,

> We appreciate that you have provided, in discovery previously produced, the Program
> Integrity/Office of Healthcare Financing, MFCU and Wyoming DCI audit or investigative
> materials related to the investigation into Dr. Gibson Condie and BHBMHG, covering the
> time period of approximately July 12, 2010 through on or about November 20, 2012 (these
> are Bates numbered Barrus 201676 through 201704 in my government discovery materials)
> and, with respect to this specific prior audit or investigation, simply request that the
> discovery production by complete.
>
> However, we know that there were any number of audits and/or patient records requests
> made of NWTC by Wyoming Medicaid and/or its authorized agents, throughout the time of
> NWTC providing Wyoming Medicaid enrollees or beneficiaries services for which NWTC
> billed Wyoming Medicaid, for which Wyoming Medicaid paid claims submitted by NWTC,
> and which are related to the fraud charges you are prosecuting in this matter. None of those
> audits and/or patient records requests appear to have been produced, to date, in government
> discovery in this matter. Accordingly, we ask you to promptly produce all prior Medicaid
> audits and/or record requests of NWTC, or Big Horn Basin Mental Health Group
> (BHBMHG), as referenced above. We also ask that production of these prior audits and/or
> patient records requests be in the form maintaining the integrity of that prior audit and/or
> record request, *e.g.*, **the April 2012 audit and/or records request** be produced in its entirety,
> but segregated from any prior or subsequent audit and/or records request that also are to be
> produced. Again, we believe the information reflected in or by these various audits and/or
> records requests is exculpatory to these defendants in this matter and material to the question
> of any alleged fraudulent intent the government will have to prove at trial in this matter.
> Accordingly, we ask you to promptly produce any and all prior audits and/or patient records
> requests referenced above.

(*Attachment 11* hereto) (emphasis added).

9

> 5. Prior Medicaid audits and/or record requests: We believe we have provided you all audits and record requests in the possession of the prosecution team. Please identify any additional audits or requests that your clients believe occurred so we can verify whether the prosecution team has any records related to those audits/requests and, if not, whether we have any ability or obligation to obtain those records for you.

(October 22, 2021, email from AUSA Heimann to all defense counsel (emphasis in original)). AUSA Heimann also had indicated to counsel for the Defendants that he anticipated taking some time to review and respond to our *Brady* request and that any response may include all or much of the volume of discovery produced in the *Condie* federal prosecution. Defendants' counsel had no desire to comb through another approximately 150,000 pages of discovery in the hope of locating the various missing audits and records requests. Further, the Government's failure to include those records in its previous discovery production(s), and its October 22, 2021, identification of the "prosecution team," left counsel concerned that the Government would fail to take appropriate steps and actions to ensure the audit and/or patient records requested documents were collected and produced to the Defendants. Moreover, Defendants had a limited amount of time before trial in this matter to both identify and possibly interview those associated with the prior audits performed by or on behalf of Wyoming Medicaid.

7.     Further, Travis Kirchhefer, a State of Wyoming Senior Assistant Attorney General and Director of the Wyoming Office of Attorney General's Medicaid Fraud Control Unit (hereinafter "MFCU"), is an attorney of record in this case and part of the "prosecution team."  Clearly, Mr. Kirchhefer, by virtue of his position, employment, and specific role with Wyoming Medicaid, would have access to relevant audit materials, the ostensible purpose of which is ferreting out Medicaid fraud. It is presumed that all he would have to do is request the relevant documents relating to NWTC and/or BHBMHG.

8.    Defendants' state of mind and knowledge will be a central focus at the trial. Included in the Government discovery produced in 2019 are emails of Dr. Gibson Condie corresponding with various providers in the State of Wyoming for whom Dr. Condie was acting as a third-party supervising billing agent for Wyoming Medicaid, including Mr. Barrus, Mr. Bennett and Mr. Dutson, in which Dr. Condie informed those providers of an open Medicaid investigation of his billing practices. Dr. Condie later informed the group of providers, for whom he acted as a Wyoming Medicaid third-party supervising billing agent and/or instructed on Wyoming Medicaid billing practices, that it was determined that he was properly billing after the investigation closed in 2012.[7] Again, Dr. Condie was the Ph.D.-level provider who submitted NWTC billing to Wyoming Medicaid from its inception until sometime in 2015, at which point NWTC took over its own Wyoming Medicaid billing.

9.    The FBI interviewed Dr. Condie on October 24, 2017, and specifically asked him about NWTC's Wyoming Medicaid billing practices. The following exchange with Dr. Condie is telling:

> DR. CONDIE: These are kids who grew up here. They've never been to Yellowstone. They've never caught a fish. They've never looked through a [sic] at a moose. And they do not know, they don't know how to entertain themselves. They don't know how to function. And they don't know how to relate to one another –
>
> MR. LYNCH: Okay.
>
> DR. CONDIE: – in the absence of drugs and alcohol. And so much of what – and their academic failure, the research is crystal clear. Their academic failure place them at a substantial risk to start using again. And so the drug treatment plans that they had over there addressed all of that. They weren't just addressing an

---

7 Dr. Condie also echoes this position when speaking to FBI Agents on October 24, 2017, telling agents that in 2013 MFCU had told him by letter that his billing practices were in accord with the applicable rules and regulations.

overly depressing or an underlying anxiety. They were teaching them academic skills, social skills, functional interactive skills, self-help skills. They were teaching them all the things that they needed to know –

MR. LYNCH: Okay.

DR. CONDIE: – in order to be able to take care of themselves and to return to the Reservation, in this case, and successfully return to school. And because failure in school is almost 100 percent guarantee that someone will go back and start using again. And then you're sort of starting all over. **Well, the treatment center was billing these services, including what I would call therapeutic educational support services, they were billing that under this not otherwise specified, the H-0040**.

MR. LYNCH: **Okay. Did they do that based upon your advice?**

DR. CONDIE: **They did, uh-huh.**

MR. LYNCH: **Okay**.

DR. CONDIE: **And I did it based on my review and my research of what –**

MR. LYNCH: **Okay. What you thought was appropriate.**

DR. CONDIE: **Yeah.**

*See* Transcript of Police Interview of Dr. Gibson Condie at pp. 132-33 (bold emphasis added).

10.    Additionally, Dr. Condie discussed audits with the FBI Agents interviewing him, stating that an audit occurred "on average about once a year." *Id*. at p. 137. Further, specific to NWTC, Dr. Condie stated as follows:

MR. LYNCH: So Northwest was not a part of a system to generate large bills?

DR. CONDIE: No.

MR. LYNCH: Okay.

DR. CONDIE: No. In fact, Northwest – well, **Northwest, also they get audited, you know, about once a year like we do**. But, or like mental health providers do. But they also have to send in, a the end of every year they have to send in a quality review. They have a certain percentage of their client's [sic] files from that year get packaged up and they had three quality reviewers that look at them. Now, actually I did, I was one of their quality reviewers that looked for accuracy and for proper documentation. But I wasn't paid for that. There was no –

MR. LYNCH: Okay.

DR. CONDIE: There was me and a couple of other mental health professionals. **And then after we had done our quality review, then they would send all that into Cheyenne, as a part of doing business. It's just a requirement of a facility like theirs**.

MR. LYNCH: Okay.

DR. CONDIE: And they had the exact same experience. They never ever got any feedback, any response at all –

*Id*. at p.139 (bold emphasis added). Defendants continued to thoroughly document and bill, as Dr. Condie had trained them to do. Defendants believe that NWTC patient records will show that NWTC consistently submitted accurate and complete records in response to each and every one of Wyoming Medicaid's numerous audit and/or NWTC patient records requests.

11.     Because the Government continued to withhold production of any additional BHBMHG or NWTC audits and/or NWTC patient records requests in response to Defendants' August 13, 2021 *Brady* demand, Defendants, on November 9, 2021, some two years following the return of their *Indictment* in this matter, necessarily found themselves having to resort to this Court's subpoena authority under Rule 17(c), F.R.Cr.P. (ECF No. 130). Learning of Defendants' resorting to this Court's subpoena authority, these federal prosecutors chose to attempt to interfere with those subpoena efforts by formally requesting that this Court quash *all* subpoenas issued, including those

subpoenas issued to Wyoming Medicaid agencies the prosecution expressly represented were not part of their "prosecution team" in this case. (ECF No. 135). Following the hearing held on December 17, 2021, this Court entered its December 27, 2021 *Order Denying Government's Motion To Quash – ECF No. 135*. (ECF No. 141).

12.     On January 7, 2022, Wyoming Senior Assistant Attorney General Jackson Engels produced a substantial number of documents responsive to the subpoenas served on Wyoming Medicaid. Included in that package of documents is what appears to be a true and accurate copy of the ACS April 17, 2012, 4-page patient records request served by certified mail on NWTC (*Attachment 12* hereto). However, missing from that document production is the actual package of NWTC patient records provided to Wyoming Medicaid in response to the April 17, 2012, patient records request. Counsel for Mr. Bennett has now, by email correspondence to Senior Assistant Attorney General Engels dated January 21, 2022, and January 24, 2022, formally requested those NWTC patient records be produced to Defendants. As of the filing of this motion, those NWTC patient records provided to Wyoming Medicaid in response to the April 17, 2012, patient records requests have not been produced.[8]

Mr. Kirchhefer formally informed Defense counsel he was taking responsibility for responding to the Rule 17(c) subpoena served on MFCU. To date Mr. Kirchhefer has failed to produce a single additional BHBMHG or NWTC audit and/or NWTC patient records requests in response to that subpoena.

---

[8] Counsel for Mr. Barrus has been engaged in the painstaking effort to recreate, from the approximately 100,000 NWTC patient records produced in discovery by the Government in 2019, along with the relevant NWTC patient records also located within the 30 boxes of records retrieved my Mr. Bennett's counsel in January 2020 from NWTC's Julie Lane facility, those NWTC patient records corresponding with that April 17, 2012, Wyoming Medicaid records request.

13.     Also included within that package of documents produced by Senior Assistant Attorney General Engels is a 7-page document that includes a December 8, 2010, form and attached letter from a Powell, Wyoming provider named Nate Cook, stamped "received" by the Wyoming Department of Health December 14, 2010, in which Nate Cook alleges in pertinent part:

> This letter is in regards to what I believe to be, abuse of the EqualityCare Healthcare System. I will attempt to be brief. * * *
>
> I have addressed these issues with the therapists and their Medicaid supervisor in the past, per my code of ethics as set forth by NASW. My attempts to address this have gone unheeded.
>
> The therapists and organization mentioned above for the last 2-3 years have run, in my professional opinion, groups that fail to meet professionally recognized standards that are then billed to Medicaid as therapeutic in nature. Other professionals around the area, as well as citizens in the community, have commented on these groups. Examples are: 2-3 hour long football and basketball games with little to no therapeutic intervention being done. Going to the college gym to lift weights where the therapist puts in his headphones to listen to his music and lift weights while the clients lift weights or go into the gym unsupervised. Citizens in the community have complained about the students kissing in the gym unsupervised. All day trips to the zoo. These are just a few of many. There is a laundry list of incidents like these, but I will limit this report to the ones stated above. These types of "groups" happen several times a week. Their website states that each student receives 30 hours of treatment. It appears that it is a mass group for mass billing. Professionals in the area refer to these "groups" as play time, in a mocking sense because they too have witnessed it. I started my career aa a frontline staff in a facility such as this in Utah and this is what you pay frontline staff to do with zero therapeutic value.
>
> It is easy to write a note and make it look like therapy was done. I imagine that interviews with staff and client may need to be done. It is frustrating as a mental health professional to see these types of services devalued due to these practices. I hope that people in our community do not judge the work other professionals do due to these practices. Another frustration is the economic cuts that have occurred and then to see this.

(*Attachment 13* hereto). Thus, Wyoming Medicaid was in possession of a formal provider complaint regarding NWTC adolescent addiction treatment as early as December 14, 2010. Included as part of that 7-page document is an "ANALYST REPORT CASE #1349" prepared by a "K.L. Kinneaster, Investigative Analyst" in which Analyst Kinneaster reports her "Analysis was performed in an attempt to determine whether excess services were being billed by NWTC and the secondary provider, Big Horn Basin Mental Health Group" and that includes the following conclusions and recommendations:

> CONCLUSIONS: As a result of the analysis of the queries it was determined that not only was the provider(s) using the listed procedure codes extensively but were also billing for services for extended dally periods of time, many in excess of eight (8) hours a day and some in excess of fifteen (15) to twenty (20) hours a day. Along the lines of procedure usage at least one claim (TCN 3-09133-00-057-0000-10) procedure codes H000S, H0006, H0047 and H2015 were possibly improperly utilized. The procedure code H2021 is used extensively, if not excessively, in comparison with other recipients of the other queried providers. This, as well as the H2015 procedure, falls into the category of a service that cannot/has not been clearly defined. Billing in many cases, for both providers, was done for spans of time. In comparison with the other providers this was an anomaly that contributed heavily to confusion In the review by the analyst. This sort of billing may or may not have that purpose in mind. This sort of activity would be normal for an entity attempting to mask un-provided services. Based upon the comparison with other providers of the same type/taxonomy the services provided were excessive.
>
> RECOMMENDATIONS: It is the recommendation of the analyst that reviews be conducted for many of the indicated dates of service. Special attention should be given to the accounting of the services provided for H2021 and H2015. Though there have been several procedures listed in this narrative, examination should not be limited to these as others were identified In the performance and analysis of the queries. A substantial amount of funds have been expended paying for claims filed by these providers. So much so that if records cannot be provided, for various reasons,

16

some consideration could/should be considered for some sort of criminal action based on fraudulent claims.

TOTAL    POTENTIAL    FOR    RECOVERY    FROM QUESTIONABLE CLAIMS: $640,477.61

(*Attachment 13*, *supra*). That 7-page document contains a "Wyoming Department of Health - Office of Healthcare Financing CURT Referral Form" submitted by a Susan Malm[9], requesting that an "appropriate random sample [be done] to review [the attached] information." *Id.*

14.    The complaint originating on December 8, 2010, specifically named NWTC and each of the Defendants currently charged herein. Importantly, after the Wyoming Program Integrity Unit reviewed the matter, it forwarded it on to the MFCU. The investigation ultimately lasted years, and included interviews, written questions to Dr. Condie, and audits of NWTC patient records and the billing for those services.[10] This leads to the inevitable question: What did MFCU conclude at the end of its investigation of alleged fraud by Dr. Condie and NWTC?  The Director of MFCU, Christine Stickley, concluded, in relevant part, as follow:

> **The MFCU has finalized our review of all information from our investigation and has not identified at this time any fraudulent activity and has therefore elected to close further review of the allegations.**

(*See Attachment 14* – January 28, 2013 Letter from MFCU Director Christine Stickley to Dr. Gibson B. Condie (bold emphasis added)). The government withheld this piece of exculpatory evidence until *after* the State of Wyoming produced it on January 7, 2022, and only in direct response to the subpoena the government failed in its attempt to quash. This correspondence originated from the

---

9 Recall, Susan Malm is the author of the Healthcare Financing December 21, 2012, patient records request sent to NWTC (*Attachment 9*, *supra*) that was not produced by these federal prosecutors and instead was located by counsel for Mr. Bennett during the January 2020 visit to NWTC's Julie Lane facility.

MFCU. The "prosecution team" has been in possession of it the entire time and only begrudgingly turned it over in response to the Court's subpoena and, likely, after knowing that it had been provided to the defense by other state agencies.

Counsel for Defendant Bennett learned, after deciding to re-interview a former employee of Program Integrity in light of some of the newly obtained documents through subpoenas, that evidentiary materials relevant to this case had been provided to not only the MFCU (as part of the original investigation and again in the 2015-2016 time frame), but had been forwarded to an FBI agent and sent directly to the United States Attorney's Office. Included in the materials that are believed to have been provided to the United States is a recording of a phone conversation, and/or a transcription of the same, with the same former Director of MFCU who wrote the letter to Dr. Condie asserting that, as of 2013, "no fraudulent activity" was identified as part of the State's investigation. In the recording, which the United States is believed to have been in possession of since approximately 2016, the former Director of MFCU, who was and is a lawyer, states that, as of 2013, the rules and regulations regarding Medicaid billing had to be worked on and "clarified" to eliminate "wiggle room" in the rules regarding what could legitimately be billed to Medicaid. The exculpatory nature of this comment—made by a lawyer who headed up the MFCU—is evident on its face. However, the prosecution has never produced this material to the defense.

Counsel for Mr. Bennett, upon learning of this, conferred with the Government. (See *Attachment 15* – January 20, 2022, letter). In response to the request that the Government produce all exculpatory materials or "material" evidence under Rule 16, the Government initially responded by saying that it would "promptly" respond and that it would comply with its "upcoming

---

10 As previously indicated, all Medicaid billing was required to go through a doctorate level supervising biller until July 2014.

*Brady/Giglio* disclosure deadline." When it was pointed out that *Brady* materials were ordered to be provided "promptly," not twenty-one days out from trial like *Giglio* materials, and that discovery was due years ago, the Government responded that it understood its discovery obligations. Ultimately, the Government stated that it would not provide any further materials related to this case that it admitted it has had in its possession since 2016. Apparently, the Government submitted materials to the Court for its in camera review on January 25, 2022.

In light of this case being less than thirty days from trial, the Government's history of not producing exculpatory evidence in this case, and the Government's active efforts to block Defendants' attempts to obtain the materials, Defendants believe it proper to bring these issues before the Court.

### LISA BROCKMAN "WILL OPINE . . . WYOMING MEDICAID WOULD NOT HAVE PAID FOR THESE ACTIVITIES IF THE PROGRAM HAD KNOWN THEIR TRUE NATURE"
- *Government's Expert Witness Designation* (ECF No. 153)

15. Lisa Brockman has worked for Healthcare Financing, Providers Services Unit since at least 2011, which is part of the very same Wyoming Medicaid agency that was on the front lines of each and every BHBMHG and NWTC audit and NWTC patient records request relevant to this prosecution. And while these federal prosecutors, throughout this prosecution, have tried to dodge any responsibility for producing to these Defendants the documentation involving Wyoming Medicaid audits of BHBMHG and NWTC, and NWTC patient records requests, by asserting "that Wyoming Medicaid (including its Program Integrity Unit) is <u>not</u> part of the prosecution team, which consists of the USAO, the Wyoming AG's Medicaid Fraud Control Unit, and the FBI's case agents,"[11] the reality is that the MFCU became fully aware of Healthcare Financing's and the

---

11 AUSA Heimann October 22, 2021 email to Defense counsel, *supra*.

Program Integrity Unit's investigation into, and reviews performed on, NWTC's patient records and billing practices, as will be shown below.

16.     As indicated previously (note 5, *supra*), on November 5, 2021, some two years after the discovery production date this Court set, the Government produced to these Defendants an unredacted version of the MFCU investigation report. (*Attachment 16* hereto). As counsel for Mr. Barrus represented to this Court at the December 17, 2021 hearing on the Government's motion to quash the Wyoming Medicaid subpoenas, that November 5, 2021 production was the very first time the Government produced to counsel a report of MFCU Investigator Greg Smith's March 13, 2012 interview of Mr. Barrus; that interview included Smith questioning Mr. Barrus about NWTC and in particular Gibson Condie's billing practices for NWTC and directions Condie provided Mr. Barrus with respect to NWTC's Wyoming Medicaid billing. *Id.*, pp. 10-12.

This unredacted MFCU Investigation report also is the first time these Defendants were provided with MFCU Investigator Smith's reports of interviews of Nate Cook and numerous other providers for whom Dr. Condie had been billing Wyoming Medicaid, all of which previously had been redacted. MFCU Investigator Smith's March 3, 2011 – recall, this is just three months after Cook's December 8, 2010, letter to Healthcare Financing (*Attachment 13*, *supra*) – interview of Cook included:

> Nathan Cook said he also had concerns about some therapy practices by another mental health and addiction treatment company in Powell, Wyoming, whose therapists were being supervised regarding Medicaid issues by Dr. CONDIE. Mr. Cook said the name of the organization is North West Wyoming Treatment Center (NWWTC). Mr. Cook said he thought NWWTC was formerly owned by Dr. CONDIE, but believes it is now owned by other people including Gregg Bennett and Ty Barris (*sic*), and possibly others.

Mr. Cook said that he was concerned that NWWTC was billing Wyoming Medicaid for recreational therapy when they brought groups of youths together to play sports or lift weights at the gym. Mr. Cook said he heard from other local therapists who said NWWTC staff would have youth play sports or lift weights without any direct supervision. Mr. Cook did not specify who the therapists working for NWWTC were.

Nathan Cook said that he has heard Dr. CONDIE on occasion state something to the effect of "if a client is with a therapist it is therapy."

(*Attachment 16*, *supra*, pp. 3-4).

Each one of those provider interviews newly disclosed November 5, 2021, reflect that Dr. Condie gave the providers billing instructions very similar to, and consistent with, those he provided NWTC. The same general billing practices that the Government asserts constitute evidence of some fraudulent "scheme" with regard to NWTC mirrored the billing practices that providers under Dr. Condie's billing tutelage and supervision regularly employed.

Defendants' counsel knew from both the redacted MFCU investigation report produced in 2019 and the unredacted report produced November 5, 2021, that:

This case was opened by the Wyoming Medicaid Fraud Control Unit (MFCU) on July 12, 2010, based on information received from Wyoming Medicaid concerning possible fraudulent billing being submitted io Medicaid by Dr. Gibson B. CONDIE Ph.D., the owner of Big Horn Basin Mental Health Group (BHBMHG). **On or about January 29, 2010, the MFCU received a seven (7) page initial Incident Report/Case Referral report from Ms. Christine Bates, Program Integrity Manager with the Office of Healthcare Financing. (ENCLOSURE #1)**. The report indicated that Wyoming Medicaid had the following concerns with Dr. CONDIE and the BHBMHG:

Billing using incorrect codes and possible ownership issues - Medicaid received letterhead from three different companies, but only have one enrolled indicating Dr. CONDIE may have interest in referring patients between facilities. There were also concerns that Dr. CONDIE was billing for more units than was actually

21

> documented and billing for services without the proper treatment
> plans per Medicaid rules.

(*Attachment 16*, *supra*, p. 1) (emphasis added). Defendants' counsel similarly knew from both the

redacted and unredacted MFCU reports that Lisa Brockman had interviewed Cook on March 3,

2011:

> On March 14, 2011, SA Smith received a two page written
> statement by e-mail from Lisa Brockman outlining her interview
> with Nathan Cook and Chris Addison on March 3, 2011.
> (ENCLOSURE # 3).

*Id*. And with the November 5, 2021 production of the *unredacted* MFCU report that Defendants'

counsel learned:

> On March 3, 2011, SA Smith and Audit Investigator Sharon
> Kuster returned a telephone call to Nathan N. Cook . . . . **Nathan
> N. Cook and Chris Addison met with Lisa Brockman,
> Behavioral Health Services Manager for Medicaid, on March
> 1, 2011, to report some possible illegal or inappropriate
> Medicaid billing being perpetrated by Dr. Gibson CONDIE**.
> **Lisa Brockman and Nathan N. Cook contacted SA Smith on
> March 1, 2011, to advise him of the complaint and to have SA
> Smith contact Nathan N. Cook on March 3, 2011, for
> complete details.**

*Id*., pp. 1-2. However, the heightened relevance and importance of Lisa Brockman's March 3, 2011,

interview of Nate Cook became much more apparent once Defendants' counsel, only this month,

learned from the Wyoming Medicaid documents produced in response to Defendants' subpoena, of

Nate Cook's December 8, 2010, letter to Healthcare Financing alleging NWTC's adolescent

addiction treatment constituted "abuse" of the Wyoming Medicaid system (*Attachment 13*, *supra*),

along with the related formal production by Wyoming Medicaid of the ACS April 17, 2012,

extensive NWTC patient records request and subsequent Susan Malm, Healthcare Financing

December 21, 2012 patient records request sent to NWTC. (*Attachment 9*, *supra*).

17.     It is against this backdrop, unequivocally showing Ms. Brockman's involvement in the prior 2010 – 2012 MFCU and Wyoming Medicaid investigation into Gibson Condie, BHBMHG, and NWTC, that the Government comes before this Court and designates Ms. Brockman to testify, as an expert, to the following:

> (2) procedure codes H0005, H0047, H2015, and H2015-HK used by the Defendants and NWTC employees at the direction of the Defendants to bill these non-covered services did not accurately describe these activities **such that Medicaid could determine whether the services were covered**; (3) Wyoming Medicaid would not have paid for these activities **if the program had known their true nature**; and (4) the services NWTC billed under procedure code H2021 did not qualify as H2021 community mental health treatment, **and Medicaid would not have paid these bills if the program had known the true nature of the billed-for services**.

(ECF No. 153; Government's Expert Witness Designation, pp. 5-6 (bold emphasis added)).

AUSA Heimann has known for at least 21 months he would be designating Ms. Brockman to testify to opinions that if Wyoming Medicaid had only known about NWTC's adolescent addiction treatment services being provided and billed to Wyoming Medicaid, had only known about the billing codes being applied to those addiction treatment services, Wyoming Medicaid would not have paid NWTC $8.5 million dollars over a period from 2009 to 2016.  *See Transcript of Motions Proceedings*, April 24, 2020, p. 32. This position strains credulity, at best. Further, knowing he would be attempting to designate Ms. Brockman (and two others to offer the identical position) makes these materials the Government has been withholding for years all the more relevant.

### BRADY AND THESE DEFENDANTS' RIGHT TO DUE PROCESS

18.     *Brady v. Maryland*, 373 U.S. 83 (1963) held that if the prosecution suppresses evidence favorable to an accused after a request, it is a due process violation where the evidence is material either to guilt or to punishment. This is true irrespective of the prosecution's good or bad

faith. "[I]f the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge." *United States v. Agurs*, 427 U.S. 97, 106 (1976). These Defendants' right to due process requires that the Government do better:

> Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed. As we observed in *Strickler*, defense counsel has no "procedural obligation to assert constitutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred." 527 U.S. 263 at 286-287, 144 L. Ed. 2d 286, 119 S. Ct. 1936. The "cause" inquiry, we have also observed, turns on events or circumstances "external to the defense." *Amadeo v. Zant*, 486 U.S. 214, 222, 100 L. Ed. 2d 249, 108 S. Ct. 1771 (1988) (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 91 L. Ed. 2d 397, 106 S. Ct. 2639 (1986)). The State here nevertheless urges, in effect, that "the prosecution can lie and conceal and the prisoner still has the burden to . . . discover the evidence," Tr. of Oral Arg. 35, so long as the "potential existence" of a prosecutorial misconduct claim might have been detected, *id.*, at 36. A rule thus declaring "prosecutor may hide, defendant must seek," is not tenable in a system constitutionally bound to accord defendants due process. "Ordinarily, we presume that public officials have properly discharged their official duties." *Bracy v. Gramley*, 520 U.S. 899, 909, 138 L. Ed. 2d 97, 117 S. Ct. 1793 (1997) (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15, 71 L. Ed. 131, 47 S. Ct. 1 (1926)). We have several times underscored the "special role played by the American prosecutor in the search for truth in criminal trials." *Strickler*, 527 U.S. 263 at 281, 144 L. Ed. 2d 286, 119 S. Ct. 1936; accord *Kyles*, 514 U.S. 419 at 439-440, 131 L. Ed. 2d 490, 115 S. Ct. 1555; *United States v. Bagley*, 473 U.S. 667, 675, n. 6, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985); *Berger*, 295 U.S. 78 at 88, 79 L. Ed. 1314, 55 S. Ct. 629. See also *Olmstead v. United States*, 277 U.S. 438, 484, 72 L. Ed. 944, 48 S. Ct. 564 (1928) (Brandeis, J., dissenting). Courts, litigants, and juries properly anticipate that "obligations [to refrain from improper methods to secure a conviction] . . . plainly rest[ing] upon the prosecuting attorney, will be faithfully observed." *Berger*, 295 U.S. 78 at 88, 79 L. Ed. 1314, 55 S. Ct. 629. Prosecutors' dishonest conduct or unwarranted concealment should attract no judicial approbation. See *Kyles*, 514 U.S. 419 at

> 440, 131 L. Ed. 2d 490, 115 S. Ct. 1555 ("The prudence of the
> careful prosecutor should not . . . be discouraged.").

*Banks v. Dretke*, 540 U.S. 668, 695-96 (2004).

Healthcare Financing and its Program Integrity Unit very clearly have been integrally involved, for years, in the investigation of NWTC.  In this felony prosecution for alleged Wyoming Medicaid fraud, these two federal prosecutors have engaged in nothing short of an untenable pattern of "we will hide behind our artificial screen between MFCU and Wyoming Medicaid to refuse to produce exculpatory evidence related to our felony fraud charges, and you Defendants will just have to go seek that evidence, if you can find it." Additionally, the Government has actively obstructed Defendants' efforts to uncover the whole truth.

Moreover, a litigation strategy to designate Ms. Brockman, an employee of Healthcare Financing – who the Government asserts is not a part of the "prosecution team" – to testify to opinions that "Wyoming Medicaid just didn't know" all those years when it paid NWTC, month after month without any questioning or concerns *expressed to NWTC*, to excuse producing exculpatory evidence to these Defendants, is untenable. This is evidence in the possession of Wyoming Medicaid and of which these federal prosecutors not only have reason to believe exists, but have been told by defense counsel, in fact, exists. Again, due process requires these two prosecutors do better.

> [A]ny argument for excusing a prosecutor from disclosing what
> he does not happen to know about boils down to a plea to
> substitute the police for the prosecutor, and even for the courts
> themselves, as the final arbiters of the government's obligation to
> ensure fair trials.

*Kyles* v. *Whitley*, *supra*, 514 U.S. at 438; *see also Tennison* v. *City and County of San Francisco*, 570 F.3d 1078,1087 (9th Cir. 2009) (restricting *Brady* duty to materials within actual possession of

prosecutor "would undermine *Brady* by allowing the investigating agency to prevent production by keeping a report out of the prosecutor's hands until the agency decided the prosecutor ought to have it, and by allowing the prosecutor to tell the investigators not to give him certain materials unless he asked for them").

The Due Process Protection Act, enacted in 2020 (signed by President Trump October 21, 2020), emphasized federal prosecutors' disclosure duties under *Brady* and, as previously pointed out, this Court's discovery and scheduling orders entered since passage of that Act made clear that the Government was to have "<u>promptly</u> disclose[d]" to these Defendants all material for which disclosure is mandated by *Brady v. Maryland*, 373 U.S. 83 (1963). The Government has failed to comply with this Court's discovery and scheduling orders.

19.    It does not matter if the Government chooses to construe all or some of this undisclosed evidence as harmful to the defense. In *United States v. Marshall*, 132 F.3d 63, 67-68 (D.C. Cir. 1998) in addressing the Government's obligations with respect to Federal Rule of Criminal Procedure 16, the Court explained: "[T]he discovery obligations mandated by Rule 16 'contribute[] to the fair and efficient administration of criminal justice by providing the defendant with enough information to make an informed decision as to plea.' Fed. R. Crim. P. 16 advisory committee note to 1974 amendment."  The Court specifically held:

> [Rule 16] covers evidence which is material "to the preparation of the defendant's defense." (emphasis added). The government ignores the words we have just italicized, reading the rule to refer to evidence which is "favorable or helpful to a defendant's defense." See Govt. Br. at 35 n.15. The rule as written does not compel the conclusion that inculpatory evidence is immune from disclosure. Inculpatory evidence, after all, is just as likely to assist in "the preparation of the defendant's defense" as exculpatory evidence.[footnote omitted] In other words, it is just as important to the preparation of a defense to know its potential pitfalls as it is to know its strengths.

26

*Id*. at 67. Finally, in addressing a situation in which the Government attempted to ignore its discovery obligations by making a similar argument to the one the Government makes here—i.e., the evidentiary material is held by an agency outside our self-defined "prosecution team"—the Court considered and rejected such an argument:

> [A] prosecutor may not sandbag a defendant by "the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial." *Brazel,* 102 F.3d at 1150 (quoting *United States v. Trevino,* 556 F.2d 1265, 1272 (5th Cir. 1977)). Under such circumstances, that evidence is "plainly within [the prosecutor's] Rule 16 'control.'"

*Id*. at 69. The Government and the MFCU have freely sought and obtained information from the other Wyoming Medicaid agencies involved in the investigation of Dr. Condie, BHMHG, and NWTC. This is clear in the evidence obtained to date. The Government cannot simply pick what it deems helpful and then feign powerlessness to obtain material evidence when it does not fit its theory of the case. That is not complying with the Government's clear discovery obligations.

20.     The Government has been on notice that Wyoming Medicaid possesses documents related to NWTC's adolescent addiction treatment and related billing to Wyoming Medicaid that are exculpatory to these Defendants and the fraud charges spelled out in the *Indictment*. Moreover, the Government has been on notice that were Ms. Brockman to testify, under oath, to an opinion that, in essence, "Wyoming Medicaid just didn't know or couldn't determine the true nature of NWTC's addiction treatment services" as they paid NWTC claims for six years, that opinion is unsupported by the facts within the possession of the Government, and within Ms. Brockman's personal knowledge. Our Supreme Court has made clear:

> First, it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State,

27

must fall under the Fourteenth Amendment, *Mooney v. Holohan*, 294 U.S. 103; *Pyle v. Kansas*, 317 U.S. 213; *Curran v. Delaware*, 259 F.2d 707. See *New York ex rel. Whitman v. Wilson*, 318 U.S. 688, and *White v. Ragen*, 324 U.S. 760. Compare *Jones v. Commonwealth*, 97 F.2d 335, 338, with *In re Sawyer's Petition*, 229 F.2d 805, 809. Cf. *Mesarosh v. United States*, 352 U.S. 1.

*Napue v. Illinois*, 360 U.S. 264, 269 (1959).

The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. *Alcorta v. Texas*, 355 U.S. 28; *United States ex rel. Thompson v. Dye*, 221 F.2d 763; *United States ex rel. Almeida v. Baldi*, 195 F.2d 815; *United States ex rel. Montgomery v. Ragen*, 86 F. Supp. 382. See generally annotation, 2 L. Ed. 2d 1575.

*Napue*, 360 U.S. at 269.

The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. As stated by the New York Court of Appeals in a case very similar to this one, *People v. Savvides*, 1 N. Y. 2d 554, 557; 136 N. E. 2d 853, 854-855; 154 N. Y. S. 2d 885, 887:

> "It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. . . . That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair."

*Napue*, 360 U.S. at 269-70.

21.     Defendants have been forced to seek the Court's intervention. Through the Defendants' efforts, and the Court's power of subpoena, we know due process requires the Government provide us with the following missing evidence:

(a) A complete package of all NWTC patient records produced to Wyoming Medicaid in response to the April 17, 2012 records request;

(b) A complete package of all NWTC patient records produced to Wyoming Medicaid in response to the December 21, 2012 records request;

(c) A complete package of those NWTC patient records analyzed by K.L. Kinneaster, Investigative Analyst, in response to the December 8, 2010 complaint lodged by Nate Cook;

(d) As referenced within the unredacted MFCU report produced November 5, 2021:

(i) "Enclosure # 1" – described as a "seven (7) page initial Incident Report/Case Referral report from Ms. Christine Bates, Program Integrity Manager with the Office of Healthcare Financing. (ENCLOSURE #1)" that MFCU received "[o]n or about January 29, 2010."

(ii) "Enclosure # 2" – described as Nate Cook's/Positive Progressions' September 2007 progress notes, *etc.*, on patient [initials "C.T."], that Cook admits to Investigator Smith to having altered, allegedly pursuant to a request of Condie.

(iii) "Enclosure # 3" – described as Lisa Brockman's email and 2-page report sent to MFCU Investigator Greg Smith: "On March 14, 2011, SA Smith received a two page written statement by e-mail from Lisa Brockman outlining her interview with Nathan Cook and Chris Addison on March 3, 2011. (ENCLOSURE # 3)."

(iv) "Enclosure # 4" – described as a 2-page written statement MFCU received from Nate Cook: "On April 18, 2011, the MFCU received a two page faxed typewritten statement from Nathan Cook outlining his conversation with SA Smith and Audit Investigator Kuster on March 3, 2011. (ENCLOSURE # 4)."

(e) All Wyoming Medicaid, Healthcare Financing, Program Integrity, or MFCU reports of any nature, other than those produced in anticipation of this federal prosecution, relating to any review Wyoming Medicaid or any of these related agencies performed on NWTC or these Defendants.

(f) Materials Program Integrity, Mark Gaskill, and/or Mark Gaskill's attorney provided to the FBI and the United States Attorney's Office in 2016, including, but not limited to a recording of Christine Stickley, ex-Director of the MFCU, having a telephonic conversation with Mark Gaskill about the problematic nature of instituting a fraud prosecution of Dr. Condie and/or NWTC because of the lack of clarity in the rules and regulations as they existed as of 2013.

(g) Any and all other evidence in the possession of Wyoming Medicaid, Healthcare Financing, Program Integrity, or MFCU that is exculpatory to these Defendants and the Wyoming Medicaid fraud charges against them, or is material impeachment evidence with respect to any Government witness expected to testify at trial of this matter, or through the exercise of due diligence these prosecutors can discover.

WHEREFORE, these Defendants respectfully request that this Court: (1) enter an order directing the Government's attorneys to immediately and without undue delay fully comply with their *Brady* and discovery obligations, in light of the above discussion and assertions made; (2) following which the Government attorneys formally represent to this Court their compliance efforts and the resulting evidence produced to Defendants; (3) hold such hearings as necessary to confirm the Government's attorneys have complied; (4) if appropriate, dismiss, with prejudice, the *Indictment* against these Defendants on the basis of the Government's willful failure to comply with its due process obligations to these Defendants and this Court's discovery orders; and, (5) order such further relief as is appropriate.

Respectfully submitted this 26th day of January 2022.

s/Terry J. Harris
Terry J. Harris, WyBar # 5-2068
HARRIS, HARRIS & QUINN, P.C.
P.O. Box 368
2618 Warren Avenue
Cheyenne, Wyoming  82003-0368
*Telephone* (307) 638-6431
tjharrispc@gmail.com

30

/s/Ian Sandefer
Ian Sandefer, WSB # 6-4334
Jamie M. Woolsey, WSB # 6-3985
Sandefer & Woolsey, Trial Lawyers, LLC
143 N. Park Street
Casper, WY 82601
*Telephone* (307) 232-1977
*ian@swtriallawyers.com*

/s/Edwin S. Wall
Edwin S. Wall # 5-2728
Wall Law Office
43 East 400 South
Salt Lake City, Utah  84111
*Telephone* (801) 746-0900
*Edwin@edwinwall.com*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served upon the parties, via CM/ECF, this 26th day of January 2022.

s/Terry J. Harris
Terry J. Harris